IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| ALCOA INC., | ) |
| | ) |
| Plaintiff, | ) Case No. 1:15-cv-01466-ELR |
| | ) |
| v. | ) |
| | ) |
| UNIVERSAL ALLOY | ) |
| CORPORATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**FIRST AMENDED COMPLAINT**

Plaintiff, Alcoa Inc. ("Alcoa"), through its undersigned counsel, files this First Amended Complaint against defendant Universal Alloy Corporation ("UAC"), and in support thereof states as follows:

**NATURE OF THE ACTION**

1. This action stems from UAC's deliberate misappropriation of Alcoa's trade secret stretch form extrusion process and all of its component parts (the "Stretch Form Process") in order to siphon away hundreds of millions of dollars of Alcoa's sales of aluminum aerospace extrusion parts (the "Stretch Form Extrusion Parts") to The Boeing Company ("Boeing").

2. Alcoa spent nearly a quarter of a century painstakingly developing its unique Stretch Form Process at its Lafayette, Indiana facility, investing millions of

dollars and thousands of manpower hours to create and optimize the proprietary processes that are used to manufacture the Stretch Form Extrusion Parts for Boeing, and implementing considerable measures to protect against the disclosure and/or misuse of those processes.

3. UAC wanted a piece of Boeing's Stretch Form Extrusion Parts business but knew that Alcoa was the only manufacturer in the world that had developed the processes necessary to make those parts to Boeing's specifications.

4. Not willing or able to expend the enormous amounts of time, money and effort needed to develop its own processes, UAC instead hired several former and current Alcoa employees and consultants, including, among others, Alan Chase, Michael Colt, Michael Fultz, Paul Scaglione, and Henry Sigler, who had been entrusted with Alcoa's trade secret information regarding the Stretch Form Process.

5. At UAC's urging, these former Alcoa employees and consultants betrayed that trust and improperly disclosed Alcoa's trade secrets to UAC, who used them for the express purpose of replicating the Stretch Form Process at UAC's manufacturing facility.

6. Once it had pilfered Alcoa's Stretch Form Process, UAC marketed itself to Boeing as a new, low cost supplier of Stretch Form Extrusion Parts—

despite the fact that it did not yet even own the equipment necessary to manufacture those parts.

7. Notwithstanding the fact that it had never manufactured a single large press Stretch Form Extrusion Part, UAC—with the security of Alcoa's former personnel and trade secret processes in hand—somehow managed to convince Boeing that it could do so. As a result, in August 2014, Boeing informed Alcoa that it was reducing Alcoa's share of the Stretch Form Extrusion Parts business by $200 million over the life of the upcoming 2016 to 2025 contract term. Alcoa subsequently learned that Boeing had contracted with UAC for the remaining share of the business.

8. Because of UAC's improper and unlawful misappropriation of Alcoa's trade secret Stretch Form Process, Alcoa has sustained substantial injuries for which it seeks appropriate judicial relief including, but not limited to, the recovery of actual damages (including compensatory and consequential damages), pre- and post-judgment interest, costs of court, and attorney's fees. Alcoa also is entitled to a permanent injunction enjoining UAC from misappropriating, retaining, using or disclosing in any manner Alcoa's trade secret Stretch Form Process.

9. Due to the deliberate, willful and malicious nature of UAC's misappropriation, Alcoa also seeks to recover punitive damages from UAC.

## **PARTIES**

10. Plaintiff Alcoa Inc. is a Pennsylvania corporation with its principal place of business located at 390 Park Avenue, New York, New York 10022.

11. Defendant Universal Alloy Corporation is a Georgia corporation with its principal place of business located at 180 Lamar Haley Parkway, Canton, Georgia 30114. According to its website, UAC is a supplier of aerospace components.

## **STATEMENT OF JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. This Court has personal jurisdiction over UAC because it is a citizen of this State.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Alcoa's request for relief occurred in this District.

## FACTUAL BACKGROUND

**A.     Development of Alcoa's Trade Secret Stretch Form Process**

15.    At its Lafayette facility located at 3131 East Main Street, Lafayette, Indiana 47905, Alcoa manufactures, among other things, Stretch Form Extrusion Parts for use in the aerospace industry.

16.    The Stretch Form Extrusion Parts are pieces of contoured aluminum ranging from 65 to 110 feet in length that are used primarily to construct the wings of airplanes.

17.    Alcoa's sole North American customer for the Stretch Form Extrusion Parts is Boeing, to which Alcoa has sold these parts for over twenty-five years.

18.    During that time period, Alcoa invested millions of dollars and thousands of manpower hours developing and optimizing its proprietary Stretch Form Process.

19.    The Stretch Form Process, used to produce Stretch Form Extrusion Parts, is a multi-staged manufacturing process during which a proprietary aluminum alloy composition in the form of a billet is processed through three different pieces of equipment: a large extrusion press, a horizontal heat treat furnace and quench, and a large stretch former. The Stretch Form Process carefully sequences a number of steps and controls a variety of precisely and

individually calibrated variables to manufacture the Stretch Form Extrusion Parts to meet tight tolerances within Boeing's exacting specifications.

20. Alcoa expended substantial time, effort and expense in developing the proprietary alloy composition used in the Stretch Form Process, the specifics of which are stored on a secure database (the "Alloy Database"). Alcoa restricts access to the Alloy Database to those who "need to know" and requires authorized users to sign confidentiality agreements before granting them access.

21. The aluminum billet made with this proprietary alloy composition is created using a proprietary alloying process that is specific to the particular alloy composition Alcoa uses. The aluminum billet is then processed through each of the Stretch Form Process stages pursuant to very precise parameters developed and optimized by Alcoa covering an extensive array of variables that can be and are carefully manipulated and controlled to produce the desired end product.

22. The first stage of the Stretch Form Process utilizes the large extrusion press, which heats the billet and forces it through an extrusion die that is custom designed by Alcoa for each specific part. During this extrusion process, Alcoa controls for a number of independent variables to optimize the strength of the material and the predictability of its stretch forming response.

23. The extruded material is next sent through the horizontal heat treat furnace and quench equipment, which is calibrated with proprietary and precise heating and quenching conditions and sequences to control the process outcome. The purpose of heat treating and quenching the extruded material is to increase the performance characteristics of the part, including, but, not limited to, its strength and hardness.

24. Once heat treated and quenched, the extruded material is sent to a large stretch former, where, after being placed in jaws with a proprietary design, the extrusion is stretched using a unique stretch form recipe that Alcoa has developed for each of the Stretch Form Parts. Stretch forming is used to create the necessary curvature of the part and to help relieve residual stress created by the heat treat and quench process.

25. During the early years of Alcoa's relationship with Boeing, the Stretch Form Extrusion Parts would come through the manufacturing process meeting specification but when Boeing would subsequently machine those parts, they would exhibit residual stress. Thus, during those early years, Boeing had to spend considerable time and resources making localized corrections to achieve its desired final product.

26. In an effort to deliver a more valuable product to Boeing that would require fewer post-machining adjustments, Alcoa began working on an iterative improvement project in the late-1990s to enhance its Stretch Form Process.

27. A mixture of art and science, this painstaking, trial-and-error process, which took place over the course of many years, consisted of making thousands of adjustments to each piece of equipment to control for and calibrate the variables specific to each part. Alcoa recorded all of the proprietary data that was accumulated, which reflected the inputs made and the outputs achieved, on "Process Target Pages" applicable to each part number and "Practices and Program Materials" applicable to each piece of equipment used in the Stretch Form Process.

28. In an effort to ensure the secrecy of its trade secret information, while also maintaining the Lafayette facility's ability to function and manufacture Stretch Form Extrusion Parts, Alcoa stored the Process Target Pages and Practices and Program Materials on secure drives and servers that only Alcoa employees and certain contractors could access.

29. In addition to these efforts, Alcoa employees and consultants—including Alan Chase, Michael Colt, Michael Fultz, Paul Scaglione, and Henry Sigler—were bound by numerous agreements and policies precluding the disclosure and restricting the use of the company's proprietary information,

including employment and consulting agreements, a code of ethics, various business conduct policies, an acceptable computer use policy and non-disclosure agreements. These agreements and policies specifically forbade use of Alcoa's proprietary information for personal benefit and disclosure to third parties.

30. Through this expensive and time-consuming iterative improvement project, Alcoa achieved significant breakthroughs for its Stretch Form Process, and, by 2008, essentially had optimized that process to the point that Boeing no longer needed to make any significant corrections to the Stretch Form Extrusion Parts produced by Alcoa.

**B.    UAC Misappropriates Alcoa's Trade Secret Stretch Form Process**

31. In order to obtain a share of Boeing's Stretch Form Extrusion Parts business, UAC devised a strategy to misappropriate Alcoa's trade secret Stretch Form Process.

32. In furtherance of that strategy, UAC began assembling each of the component parts of Alcoa's Stretch Form Process and hired key former and current Alcoa personnel who were heavily involved in the iterative improvement project and who otherwise had access to Alcoa's trade secret information relating to each stage of the Stretch Form Process, including, but not limited to Alan Chase, Michael Colt, Michael Fultz, Paul Scaglione, and Henry Sigler.

33. Specifically, the former and current Alcoa employees and contractors hired by UAC had access to information about the proprietary aluminum alloy composition, the Process Target Pages, and the Practices and Program Materials developed by Alcoa and needed by UAC to replicate Alcoa's trade secret Stretch Form Process.

34. These Alcoa employees and contractors also had extensive knowledge of, among other things, each of the machines used in the Stretch Form Process, the iterative improvement project, residual stress containment or minimization, and how to modify the variables and controls for the various component parts of the Stretch Form Process to avoid rework on Boeing's end. This knowledge was developed by and for the sole benefit of Alcoa at its Lafayette facility.

35. Upon information and belief, at the direction of UAC, the former Alcoa employees and contractors improperly disclosed to UAC Alcoa's proprietary knowledge and information relating to the Stretch Form Process, including, but not limited to, information regarding Alcoa's proprietary aluminum alloy compositions, the information captured in the Process Target Pages and the Practices Materials, and the cumulative body of knowledge and information amassed as a consequence of the multi-year iterative improvement project described above. At all times, UAC knew or should have known that the

proprietary knowledge and information obtained from these employees and contractors belonged to Alcoa and was improperly disclosed.

36. Once UAC obtained information about Alcoa's proprietary and trade secret Stretch Form Process, it began to directly compete with Alcoa for Boeing's business.

37. In the late summer of 2014, Alcoa learned that UAC had reached an agreement with Boeing to provide it with a substantial portion of its Stretch Form Extrusion Parts requirements for the next contract cycle, which begins on January 1, 2016. This lost business will cost Alcoa more than $200 million in sales over the life of the ten-year contract.

38. Upon information and belief, UAC has never manufactured a single large press stretch form extrusion product, much less engaged in the years of painstaking testing and modification necessary to develop the processes that will result in products that meet Boeing's specification and achieve the performance levels that Boeing has mandated with respect to the Stretch Form Extrusion Parts.

39. Thus, if UAC is able to manufacture Stretch Form Extrusion Parts acceptable to Boeing, it is only because UAC improperly gained access to Alcoa's proprietary Stretch Form Process as accumulated through Alcoa's iterative

improvement project and captured in the Alloy Database, the Process Target Pages and the Practices and Program Materials.

## LEGAL CLAIMS

### COUNT I
### MISAPPROPRIATION OF TRADE SECRETS

40. The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

41. This claim arises under the Georgia Trade Secrets Act (the "GTSA"), O.C.G.A. § 10-1-760, *et seq.*, which prohibits the misappropriation of trade secrets.

42. The components of Alcoa's Stretch Form Process are protected trade secrets under the GTSA.

43. Information regarding Alcoa's Stretch Form Process is not generally known or readily ascertainable to others and has substantial value to a competitor, such as UAC.

44. Alcoa created and developed its Stretch Form Process at great expense, time and effort, and Alcoa enjoyed a significant competitive advantage in the marketplace for extrusion parts as a direct result of its Stretch Form Process.

45. Alcoa took reasonable steps to ensure the confidentiality of its Stretch Form Process, including, but not limited to, labeling as "Proprietary" the files that reflect the specific alloy composition used in the process, storing those files on a

secure database and requiring employees to sign confidentiality agreements prior to accessing those files. Other documents and electronic files that reflected proprietary information relating to the Stretch Form Process were stored on servers accessible only to Alcoa employees and certain consultants. In addition, as terms of their employment and retention, Alcoa employees and consultants were subject to numerous employment agreements and business policies, all of which were designed to protect against the disclosure of Alcoa's trade secrets and other confidential information.

46. Upon information and belief, UAC misappropriated Alcoa's trade secret information, and has used this information to replicate Alcoa's Stretch Form Process without Alcoa's consent, permission, or authorization, and for UAC's sole economic benefit.

47. At all relevant times, UAC had actual knowledge that it had no consent, permission or authorization from Alcoa for its conduct.

48. UAC's misappropriation of Alcoa's trade secret Stretch Form Process and all of its components has directly and proximately resulted in Alcoa suffering loss of its capital investment and loss of potential and future profit.

49. UAC's misappropriation of Alcoa's trade secret Stretch Form Process has directly and proximately resulted in UAC gaining an unfair business advantage

in the market for Stretch Form Extrusion Parts without having to expend the effort, time, resources or capital investment required to develop and optimize the Stretch Form Process.

50. As a result of UAC's wrongful actions, Alcoa has been damaged and will continue to be damaged in an amount to be proven at trial.

51. As a result of UAC's wrongful actions, UAC has unjustly received profits in an amount to be proven at trial.

52. UAC's conduct was willful and malicious and, on that basis, requires the imposition of exemplary damages in an amount to be determined at trial.

53. As a result of UAC's actions, Alcoa is entitled to damages pursuant to the GTSA, including its costs, attorneys' fees and exemplary damages, in an amount to be proven at trial.

54. The foregoing acts of UAC have caused and will continue to cause Alcoa irreparable harm. Unless permanently enjoined, UAC's acts alleged herein will continue to cause Alcoa irreparable harm, loss and injury.

## **PRAYER FOR RELIEF**

WHEREFORE, for all of the foregoing reasons, Alcoa respectfully requests that the Court grant the following relief:

1. Judgment be entered in favor of Alcoa and against UAC for actual damages in an amount to be determined at trial;

2. An Order that UAC be enjoined from:

   a. Utilizing Alcoa's trade secrets; and

   b. Manufacturing, marketing or selling products or offering services based on or derived from Alcoa's trade secret information;

3. An award of Alcoa's actual and special damages as pleaded;

4. An award of exemplary damages against UAC;

5. An award of Alcoa's reasonable attorneys' fees and court costs in prosecuting this action;

6. An award to Alcoa of pre-judgment and post-judgment interest on all sums awarded at the highest rate permitted by law; and

7. An award to Alcoa of such further relief, legal and equitable, to which it is justly entitled.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Alcoa hereby demands a trial by jury of all issues so triable.

Dated:  June 5, 2015

Respectfully Submitted:

HOLLAND & KNIGHT LLP

/s/ *J. Allen Maines*
J. Allen Maines
Georgia Bar No.  466575
Mellori E. Lumpkin
Georgia Bar No. 358937
One Atlantic Center, Suite 2000
1201 West Peachtree Street
Atlanta, Georgia  30309
Telephone: (404) 817-8500
Facsimile: (404) 8881-0470
Email:        allen.maines@hklaw.com
                  mellori.lumpkin@hklaw.com

AND

Thomas E. Birsic *(admitted pro hac vice)*
Pennsylvania ID 31092
Melissa J. Tea *(admitted pro hac vice)*
Pennsylvania ID 80195
James P. Angelo *(admitted pro hac vice)*
Pennsylvania ID 306430
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, Pennsylvania  15222
Telephone: (412) 355-6500
Facsimile: (412) 355-6501
Email:        thomas.birsic@klgates.com
                  melissa.tea@klgates.com
                  james.angelo@klgates.com
*Counsel for Alcoa Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2015, I served a copy of the foregoing **FIRST AMENDED COMPLAINT** on the below counsel of record through the Court's CM/ECF system:

Michael J. Sullivan
Julie E. Adkins
Womble Carlyle Sandridge & Rice LLP
Suite 2400
271 17th Street, NW
Atlanta, GA  30363

David K. Herzog
Katrina M. Gossett
Matthew E. Burkhart
Faegre Baker Daniels LLP
Suite 2700
300 N. Meridian Street
Indianapolis, IN  46204

Randall E. Kahnke
Kerry L. Bundy
Tyler A. Young
Faegre Baker Daniels LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402

HOLLAND & KNIGHT LLP

/s/ *J. Allen Maines*
J. Allen Maines
Georgia Bar No.  466575

#35808087_v1