IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ARCONIC CORP. and HOWMET AEROSPACE, INC. (f/k/a Alcoa Inc.), | ) ) ) | |
| Plaintiffs/Counterdefendants, | ) ) | No. 1:15-CV-01466-JPB |
| v. | ) ) | |
| UNIVERSAL ALLOY CORPORATION, | ) ) | |
| Defendant/Counterclaimant. | ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
<u>MOTION FOR A NEW TRIAL</u>**

## **Table of Contents**

INTRODUCTION ...................................................................................1

BACKGROUND ...................................................................................4

    A.    The Trial Proceedings...................................................................4

    B.    The Verdict Form...........................................................................9

    C.    Evidence That Alcoa Owned The Claimed Trade Secrets. ...........10

ARGUMENT AND CITATION OF AUTHORITIES............................15

I.    Question 1 On The Verdict Form Addressed Only Ownership, Which Is A Limited Inquiry. .......................................................................18

II.    The Only Evidence Was That Alcoa Owned The Claimed Trade Secrets.......21

III.    There Is No Contrary Evidence. ....................................................22

IV.    UAC's Closing Argument Invited Error And Warrants A New Trial. ............23

CONCLUSION .....................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Aetna Cas. & Sur. Co. v. Yeatts*,
  122 F.2d 350 (4th Cir. 1941) ........................................................1, 15

*Ard v. S.W. Forest Indus.*,
  849 F.2d 517 (11th Cir. 1988) ....................................................17, 25

*Bank of Am., N.A. v. JB Hanna, LLC*,
  766 F.3d 841 (8th Cir. 2014) ..............................................................18

*Butts v. Curtis Pub. Co.*,
  225 F. Supp. 916 (N.D. Ga. 1964), *aff'd*, 351 F.2d 702 (5th Cir.
  1965), *aff'd*, 388 U.S. 130 (1967)......................................................16

*Christopher v. Fla.*,
  449 F.3d 1360 (11th Cir. 2006) ..................................................23, 24

*Grandison v. Smith*,
  779 F.2d 637 (11th Cir. 1986) ............................................................17

*Harris v. Orange S.A.*,
  636 F. App'x 476 (11th Cir. 2015) ....................................................20

*Highland Consulting Group v. Minjares*,
  74 F.4th 1352 (11th Cir. 2023) ....................................................20, 22

*Johnson v. FFE Transp. Servs., Inc.*,
  227 F. App'x 780 (11th Cir. 2007) ....................................................17

*McGinnis v. Am. Home Mortg. Servicing, Inc.*,
  817 F.3d 1241 (11th Cir. 2016) ..........................................................16

*Molski v. M.J. Cable, Inc.*,
  481 F.3d 724 (9th Cir. 2007) ..............................................................18

*Refresco Beverages US Inc. v. Califormulations, LLC*,
  2021 WL 4316015 (M.D. Ga. Sep. 22, 2021) ....................................................20

*Richardson v. Mason*,
  956 F. Supp. 2d 1372 (M.D. Ga. 2013) ...................................................1, 16, 17

*Seaberg v. Steak N' Shake Operations, Inc.*,
  154 F. Supp. 3d 1294 (M.D. Fla. 2015)..........................................................18, 25

*Starbuck v. R.J. Reynolds Tobacco Co.*,
  102 F. Supp. 3d 1281, 1304-07 (M.D. Fla. 2015) .............................................17

*Tracy v. Fla. Atl. Univ. Bd. of Trs.*,
  980 F.3d 799 (11th Cir. 2020) ....................................................................16, 22

*United States v. Crittenden*,
  46 F.4th 292 (5th Cir. 2022) (en banc) ...............................................................15

*United States v. Gainey*,
  380 U.S. 63 (1965)...............................................................................................15

**Federal Statutes**

Defend Trade Secrets Act, 18 U.S.C. § 1831 et seq.............................................9, 20

**State Statutes**

Georgia Trade Secrets Act, O.C.G.A. § 10-1-760 et seq.....................................9, 20

**Rules**

Federal Rules of Civil Procedure Rule 59(a).............................................................1

**Other Authorities**

*Bright v. Eynon*
  (1757) 97 Eng. Rep. 365 (KB).........................................................................15

iv

Plaintiffs Arconic Corp. and Howmet Aerospace Inc., pursuant to Rule 59(a) of the Federal Rules of Civil Procedure, hereby submit this Memorandum of Law in Support of Their Motion for New Trial.[1]

## INTRODUCTION

A new trial is needed to avoid a miscarriage of justice.  The public's confidence in the judiciary hinges on verdicts being supported by evidence.  The judicial system places great confidence in juries deciding cases, and to be sure, most of the time juries get it right.  But sometimes they do not, and when a verdict is not based on evidence, a new trial is required.  "Just as the Court must not unduly intrude upon the province of the jury, it is a dereliction of duty to allow a verdict to stand that is not authorized by the evidence." *Richardson v. Mason*, 956 F. Supp. 2d 1372, 1381 (M.D. Ga. 2013). "The exercise of [the] power [to grant a new trial] is not in derogation of the right of trial by jury but is one of the historic safeguards of that right."  *Aetna Cas. & Sur. Co. v. Yeatts*, 122 F.2d 350, 352-54 (4th Cir. 1941).  The new trial power is one "exercised in pursuance of a sound judicial discretion, without which the jury system would be a capricious and intolerably tyranny, which no people could long endure." *Id.* at 353.

The Eleventh Circuit has made clear that a new trial is required when the

---

[1] In this brief, "Alcoa" refers to Arconic and Howmet individually and/or collectively as context dictates.

verdict is against the clear weight of evidence or is a miscarriage of justice.  The verdict in this case cannot stand because there is no record evidence to support it.  The jury never moved past the first question on the verdict form, which only asked whether Alcoa owned "[o]ne or more" of the "Claimed Trade Secrets."  The only evidence in the record is that Alcoa owned what it claimed as trade secrets.  No evidence to the contrary was presented to the jury.  Under Eleventh Circuit precedent, such a verdict must be overturned and a new trial granted.

Indeed, not only was there no contrary evidence, UAC did not even argue that someone other than Alcoa owned all of the Claimed Trade Secrets.  In closing, it addressed question 1 as to only one of the many Claimed Trade Secrets (stretch percentage).  As an initial matter, even were the jury to find that a single trade secret was owned by another, that would not support answering "no" to the question whether Alcoa owned one or more of the Claimed Trade Secrets.  But what is more, UAC pointed only to facts that did not show a lack of ownership by Alcoa, but instead went to independent development, common knowledge, or lawfully obtaining the information from another (the subject of other verdict form questions).

Moreover, UAC's closing invited the error.  It improperly narrowed the grounds for liability, which provides a separate but related ground for a new trial.  UAC argued that the jury should answer "no" to question 1 because of only the stretch

2

percentage – it did not even argue that any of the other Claimed Trade Secrets were not Alcoa's property – but that is not a legally sufficient basis to answer "no."  Instead, the jury would have had to conclude that <u>none</u> of the Claimed Trade Secrets were Alcoa's property to answer "no."  UAC misled the jury by inverting the question: it incorrectly argued that if it showed lack of ownership of only one of the Claimed Trade Secrets, the jury must write "no," when in fact it was required to write "yes."  UAC urged the jury to do something that violated the instructions, and narrowed the grounds for liability.

One can attempt to deduce why the jury made a mistake.  UAC urging it to write "no" on question 1 based on evidence that required a "yes" certainly invited the mistake.  Or perhaps it was that the issue was uncontested in the evidence, and therefore not the focus of the closing presentations.  Or maybe it was confusion over the verdict form, or UAC's raw emotional appeals untethered to the evidence.  Regardless, there is no need to sort out what went wrong.  At the end of the day, no evidence supports the verdict, and so a new trial is required.

The Court and the parties invested eight years litigating this case, expending considerable resources on a hard-fought two-week trial.  In the end, the jury did not reach the merits of any contested issue, incorrectly ruling in UAC's favor on question 1 without a shred of evidence to support it.  While the parties' interests and due

process rights are substantial, there is more at stake.  What hangs in the balance is the public's confidence in the judiciary.  This is what the new trial rule is made for; it is a bulwark to protect the integrity of the jury system.  And so where, as here, a jury's verdict is not supported by evidence, it must be overturned.

## BACKGROUND

### A.  The Trial Proceedings.

This case was filed on April 30, 2015.  Dkt. 1.  It was tried for two weeks before a jury from July 11 to July 26, 2023.  Dkts. 961-62, 964, 967-71, 974-75, 977-78.  At UAC's request, the jury was presented with special interrogatories on the verdict form, as opposed to the general verdict form requested by Alcoa.  *Compare* Dkt. 972-3 (Alcoa's requested verdict form) *with* Dkt. 979 (final verdict form); *see also* Dkt. 972-4 (UAC's requested verdict form); Day 10 PM Tr.[2] 127:13-21, 135:12-140:5.  The jury returned a verdict in UAC's favor, having answered only question 1, which related to ownership of one or more of the Claimed Trade Secrets.  It did not answer the other questions on the verdict form.  Dkt. 979.

The evidence showed cavalier theft of Alcoa's trade secret information, theft that succeeded in capturing a lucrative Boeing contract worth hundreds of millions of dollars.  While the absence of evidence supporting a verdict is all that is needed to

---

[2] The trial transcripts referenced in this brief are Dkts. 998-1020.

order a new trial, the evidence underscores the miscarriage of justice from the jury never reaching the merits of the dispute in lieu of a question that was not contested. Alcoa developed a unique, valuable manufacturing process for stretch-form spar chords over decades of research, development, trial, and error.  Alcoa developed many valuable and secret parameters relating to each step of this seven-step process, including a proprietary alloy composition and specific times, temperatures, pressures, speeds, and other parameters for homogenization, extrusion, heat treat, quench, stretching, and aging.[3]  This necessary intellectual property made Alcoa the only manufacturer of these products.  Day 2 AM Tr. 57:7-10; Day 3 AM Tr. 41:17-42:4.

UAC hired away key Alcoa employees like Chip Poth, who then helped recruit others with access to Alcoa's trade secrets, including Mike Colt, Paul Scaglione, Henry Sigler, and Mike Fultz.  Day 3 AM Tr. 42:8-43:3.  And then in 2014, UAC entered a contract with Boeing to make stretch-form spar chords in a matter of months, before it even had a machine to do so – something that would not be feasible without Alcoa's trade secrets.  Day 3 AM Tr. 43:4-21.  UAC was under immense pressure – and exposed to incredible risk – to be able to manufacture the spar chords in time for the contract.  Day 9 PM Tr. 66:2-72:17, 73:3-23, 75:11-88:2.  If it failed, Boeing could have cancelled a billion-dollar contract.  Day 9 PM Tr. 72:22-73:2,

---

[3] *See generally* Day 2 PM Tr. 131:24 – Day 4 AM Tr. 33:11.

5

88:21-89:3, 92:14-93:7.  UAC was willing to take such an extraordinary risk because it knew it had Alcoa's trade secret process and it knew there was a big payday if it succeeded.  Day 8 PM Tr. 59:19-60:8; s*ee also* Day 9 PM Tr. 66:12-68:18; 71:13-73:2; 73:3-74:2.

The evidence showed UAC's extensive and shocking use of Alcoa trade secrets in all seven stages of the manufacturing process.  *See generally* Day 4 PM Tr. 96-164:10; Day 5 PM Tr. 66:1-133:16; Day 6 AM Tr. 9:21-78:25.  UAC possessed Alcoa's trade secret documents and information, freely circulated them, and used them to shortcut its own manufacturing process.  This included, for example, UAC's secret notebook containing stolen Alcoa documents showing Alcoa's trade secret information, as well as UAC's indiscriminate copying and circulating of that information.  Dkt. 988-247 (PTX-2686) at 194-237; Dkt. 988-231 (PTX-1702).  Likewise, UAC had Alcoa's heat treat and quench information, which it copied into its own documents.  Dkt. 988-218 (PTX-1653).  UAC even copied insignificant details (like footnotes and machine orientation) that had nothing to do with UAC's processes.  *Id.*; Dkt. 988-231 (PTX-1702).  UAC also received Alcoa information directly from former Alcoans, including summaries of an Alcoa report marked "Alcoa Private Information."  *See, e.g.*, Dkt. 988-58 (PTX-0206); Dkt. 988-161 (PTX-1376).  UAC also had Alcoa's alloy composition numbers, which it used to modify the chemistry of

its own alloy – as Professor Neu explained, UAC suddenly reversed course to reflect Alcoa's trade secret composition.  This despite UAC testifying falsely at depositions that it had not used *any* Alcoa information, and did not know who the "competitor" was for the alloy composition, when in fact it did have Alcoa information and knew that the "competitor" was Alcoa.  *See generally* Dkts. 981-6, Poth; 981-7, Colt;[4] *see also* Day 5 PM 20:2-22:1.  UAC was caught in another lie at trial, this time claiming it obtained Alcoa's composition from a Boeing sample, only to be revealed it already had Alcoa's numbers before it received the sample.  Day 5 PM Tr. 50:22-54:9.

The record showed an extraordinary cover up of UAC's wrongdoing.  Indeed, it showed a calculated conspiracy to steal hundreds of millions of dollars from Alcoa.  It showed how UAC risked public safety by not doing the testing required to prove its parts were reliable, instead secretly swapping its alloy composition at the last minute without even telling Boeing, which only avoided unconscionable safety risk if UAC was using Alcoa's trade secrets, which Alcoa had extensively tested.[5]

Further, UAC's trial presentation included theories the Court previously found were substantially unjustified litigation misconduct.  UAC was sanctioned for making the frivolous argument that Alcoa's stamping documents somehow shows alteration or

---

[4] Played Day 7 PM Tr. 54:23-24, 60:23-24; *see* Dkt. 981 at 1.
[5] Day 4 PM Tr. 99:12-105:7, 112:8-159:15 (Prof. Neu).

7

spoliation – sanctions that were confirmed by this Court and paid by UAC – only for UAC to amplify these frivolous arguments before the jury.  Dkt. 635-1; Dkt. 747; Dkt. 981-13, Jarrett 183:14-200:16; Dkt. 981-14, Johnson 131:16-132:22.[6]  Further, UAC argued pre-trial that it should be allowed to present its reverse engineering defense (Dkt. 840 at 8-15), which had been excluded for litigation misconduct (Dkts. 598 at 16; 676), then disclaimed that theory in favor of arguing that the same evidence went to the "readily ascertainable" question (Day 1 AM Tr. 94:11-125:25; Day 5 AM Tr. 10:3-24:10, 62:19-66:8), presenting evidence at trial under that guise – only then to abandon the "readily ascertainable" theory (which even its own expert would not endorse) and revert to its already censured reverse engineering argument, which it then tried to characterize as independent development (Day 10 AM Tr. 4:25-30:17, 62:19-66:8), which it had previously been rebuked for doing (Dkt. 598 at 10).

Unfortunately, the jury never reached these important questions.  It was diverted by question 1, which went to the uncontested issue of ownership.  This backdrop underscores the manifest injustice of the jury not reaching the merits.  Alcoa had its valuable trade secret process stolen and lost $200 million in sales to Boeing, it has spent years taking discovery, fighting to uncover UAC's wrongdoing, and preparing for this trial, only to have the jury reach a verdict on a ground on which the

---

[6] Played Day 9 PM Tr. 119:12-13, 24-25; *see* Dkt. 981 at 2.

evidence is entirely in Alcoa's favor.

**B.    The Verdict Form.**

Alcoa's claims are for violation of the Georgia Trade Secrets Act ("GTSA"), O.C.G.A. § 10-1-760 et seq.  The verdict form was derived from the Eleventh Circuit's suggested special interrogatories related to the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 et seq.  Questions 1-4 tracked the elements of a trade secret misappropriation claim under the DTSA.  *See* Dkt. 979 at 1-3.  Question 1 asked the threshold question whether any claimed trade secret was Alcoa's property. *See id*. at 1.  Specifically, it asked whether "[o]ne or more" of the Claimed Trade Secrets were Alcoa's property:

**Do you find by a preponderance of the evidence that:**
   1. One or more of the Claimed Trade Secrets are Alcoa's property?

*Id*. at 1.  Thereafter, the verdict form took a "funnel" approach; for each question, the jury was to answer "yes" so long as at least one of Alcoa's Claimed Trade Secrets that had satisfied the previous questions also satisfied that question.  Dkt. 979; Day 11 PM Tr. 80:12-83:4.  If the jury answered "no" to a question, that was a finding that *none* of Alcoa's Claimed Trade Secrets satisfied that requirement, and the jury was then directed to answer no further questions and its verdict would be for UAC.  *Id.*

The jury was instructed on the ownership element in Instruction No. 8 of the jury instructions.  Instruction No. 8 also defined the term "Claimed Trade Secrets."

Specifically, it instructed in relevant part:

> Alcoa claims that it owns trade secrets relating to its process to manufacture stretch form spar chords (the "Claimed Trade Secrets").  To prove that Alcoa owns these trade secrets, it must prove that they are its property.

Day 12 Tr. 14:14-17 (Instruction No. 8).

The jury wrote "**NO**" as to question No. 1 on the verdict form, did not answer

any other question, and found in favor of UAC.  Dkt. 979.

### C.   <u>Evidence That Alcoa Owned The Claimed Trade Secrets.</u>

Alcoa presented clear and specific evidence that the Claimed Trade secrets

were its property.  Ed Colvin, Senior Director of Technology and Metallurgy at

Plaintiff Arconic Corporation, testified:

> Q. And who owns the trade secrets today in this case?
> A. Arconic Corp., Corporation.

Day 2 PM Tr. 136:9-10.  Mr. Colvin then proceeded to identify the specific

trade secrets to which he was referring as owned by Alcoa.  *See generally* Day

2 PM Tr. 131:24 – Day 4 AM Tr. 33:11.  His testimony included, *inter alia*:[7]

- The targets and ranges of the C545 alloy composition, contained in Dkt. 988-40 (PTX-0119).  Day 3 AM Tr. 80:22-83:24, 84:16-87:16 (describing Alcoa's development of C545); Day 3 PM Tr. 4:23-5:5 (ownership).
- Alcoa's homogenization parameters for the C545 alloy, as shown in Alcoa's Preheating Procedure document.  Dkt. 988-41 (PTX-0122); Day 3 AM Tr. 100:5-103:17, 104:10-23, 106:6-107:9; Day 3 PM Tr. 5:6-10.

---

[7] Given space considerations, these examples are not exhaustive.

10

- Alcoa's extrusion settings for 2224 and 7150 given in Alcoa's Extrusion Press Process Control Procedure, specifically the settings on page 21 of Dkt. 988-238 (PTX-2132). Day 3 AM Tr. 112:11-20, 113:19-116:19; Day 3 PM Tr. 7:1-5, 7:14-16, 5:13-6:25, 7:21-16 (describing Alcoa's development process).

- Alcoa's heat treat times and temperatures contained in Alcoa Lafayette's Horizontal Heat Treat Process Control Procedure document. Day 3 PM Tr. 31:16-20, 28:23-30:8 (describing Alcoa's development process); Dkt. 988-199 (PTX-0421); Dkt. 988-188 (PTX-0420); Dkt. 988-120 (PTX-0422); Dkt. 988-84 (PTX-0259); Day 3 PM Tr. 17:11-28:22.

- Alcoa's quench settings for 2224 and C545 shown in PTX-0422 at 9 (Day 3 PM Tr. 35:7-39:12), and Alcoa's specific quench procedures as shown in Alcoa Process Targets Pages including Dkt. 988-4 (PTX-0008). Day 3 PM Tr. 39:13-41:25, 59:11-60:13 (discussing PTX-0008); Day 3 PM Tr. 45:15-17.

- Alcoa's stretch percentage for the stretch-formed spar chords, shown on Alcoa's Process Targets Pages, including PTX-0008. Day 3 PM Tr. 50:9-11, 59:1-25, 62:2-20 (discussing PTX-0008), 47:14-49:17.

- The information in Alcoa's Age Process Control Procedure document (Dkt. 988-293 (PTX-3920)), including the times and temperatures for the first and third steps (at page 12). Day 3 PM Tr. 109:14-111:12, 113:17-25; 111:13-112:2, 112:18-113:16 (describing research and development).

- Alcoa's equation and constants for the second aging step, contained in Alcoa's Aging Integration Practice Sheet (Dkt. 988-117 (PTX-0410)) and T77 Alcoa Second Step Age Process Control Procedure (Dkt. 988-35 (PTX-0111)). Day 3 PM Tr. 123:14-16, 114:8-115:16, 115:23-117:5, 119:5-18.

Alcoa's name and logo were on each of the exhibits listed above. Throughout this testimony, Mr. Colvin referred to the information as "Alcoa's" and described Alcoa's process of developing this information at Alcoa facilities.

Further, as to the alloy composition, Melissa Griffith testified regarding Alcoa's development of its C545 alloy, which even UAC's counsel characterized as Alcoa's

alloy.  Dkt. 981-17, Griffith 115:24-116:12,[8] 145:1-2 (UAC counsel: "And how does

that work with C545, which is . . . your alloy?").  Boeing witness Victoria Micheau

testified that Boeing regards the specifics of how Alcoa makes its alloy as proprietary

to Alcoa.  Dkt. 981-4, Micheau 237:13-17.[9]  UAC witness Michael Colt admitted that

the alloy composition numbers in exhibit DTX-0759 (Dkt. 987-64 (a UAC email)) are

"Alcoa's numbers."  Day 8 PM Tr. 74:20-23.  UAC witness Victor Dangerfield

answered questions on "Alcoa's [alloy composition] ranges," and "UAC's U724 alloy

composition."  *See, e.g.*, Day 5 PM Tr. 6:22-7:10.  *See also* Day 5 PM Tr. 40:2-4

(Dangerfield agreeing that it "sounds reasonable" that "alloy compositions are some

of the most highly protected trade secrets a company has"), 7:15-20.

As to homogenization, Alcoa employee Melissa Griffith testified that she

regards Alcoa's specific homogenization practice for C545, including times and

temperatures, as confidential information of Alcoa.  Dkt. 981-17, Griffith 109:10-

110:16.  Griffith further testified that Alcoa uses its homogenization practices to make

spar chords for Boeing.  *Id.* 107:22-108:18.  UAC counsel referred to the

homogenization process as "Alcoa's."  *Id.* 107:3-4, 22-23.

As to both aging and extrusion, copies of Alcoa's Claimed Trade Secret

---

[8] Read into the record Day 10 AM Tr. 32:22-55:13; *see* Dkt. 981 at 2.
[9] Played Day 6 PM Tr. 52:10; *see* Dkt. 981 at 1.

documents were in UAC's Metallurgical Operating Standards binder.[10]  UAC CEO

Colt admitted that UAC had Alcoa's information and of course this included the Alcoa

documents in the secret notebook.  *See* Day 8 PM Tr. 87:7-88:8.  As to aging in

particular, Alcoa's Griffith testified that Alcoa developed its aging processes for the

C545 alloy.  Dkt. 981-17 at 170-71, 177-78.  Boeing witness Micheau testified that

Boeing considers Alcoa's times and temperature and procedures of aging of 7150

parts to be proprietary to Alcoa.  Dkt. 981-4, Micheau 238:10-14.

As to extrusion, Dangerfield described a page from the copy of Alcoa's

Extrusion Press Process Control Procedure in UAC's secret notebook as "an Alcoa

document" and testified that he had used this information.  Day 5 AM Tr. 87:12-93:7.

On cross, Dangerfield admitted that UAC actually had Alcoa's information, and that

he used Alcoa information for background purposes and to compare it to UAC's own

processes.  Day 5 PM Tr. 4:24-5:19.

As to heat treat and quench, Micheau testified that Boeing regards the specifics

of Alcoa's times and temperatures as proprietary to Alcoa.  Dkt. 981-4, Micheau

237:23-238:9.  Witness Michael Fultz, a former Alcoa employee who had gone to

---

[10] *See* Dkt. 988-247 (PTX-2686) at 194-217 (copy of Alcoa's Extrusion Press Control Procedure (PTX-2132)), 218-237 (copy of Alcoa's Age Process Control Procedure (PTX-3920)); Dkt. 988 (PTX-1720) at 194-229; Day 4 PM Tr. 108:9-109:16; Day 5 PM Tr. 70:9-24 (expert Prof. Neu testifying that the documents in UAC's binder are copies of these Alcoa documents).

work for UAC, testified that he considered Alcoa's heat treat and quench practices as "Alcoa information."  Dkt. 981-1, Fultz 36:14-37:1.[11]

This is direct and clear evidence that Alcoa owns the Claimed Trade Secrets. There is no evidence that anyone else owned them.

UAC's closing made this point clear by failing to identify any evidence that someone other than Alcoa owned the Claimed Trade Secrets.  Day 12 Tr. 72:9-115:20. Indeed, as to question 1, UAC only made an argument as to <u>one</u> of the many trade secrets, the stretch percentage.  Day 12 Tr. 95:5-16.  But even as to that, it pointed to evidence about whether it or someone else independently developed the stretch percentage, or whether it was common knowledge or readily ascertainable (the subject of questions 2, 3, and 6).  UAC did not present evidence that someone else owned the stretch percentage Alcoa claimed (because there was none).  Importantly, it only argued question 1 as to the stretch percentage, not as to the many other trade secrets.

The lack of evidence contradicting Alcoa's ownership is reinforced by UAC's motion for judgment as a matter of law, Dkt. 973-1.  There, UAC moved on every element of trade secret misappropriation except ownership, and seemed to concede ownership by requesting the Court "grant UAC's Motion because no reasonable jury could find that: (1) <u>Plaintiffs' information</u> meets the statutory requirements for trade

---

[11] Dkt. 981-1; Played Day 6 PM Tr. 49:10; *see* Dkt. 981 at 1.

secret protection . . . ." Dkt. 973-1 at 11 (emphasis added).

At no point during the trial did anyone other than Alcoa assert ownership of any

of the Claimed Trade Secrets.

## <u>ARGUMENT AND CITATION OF AUTHORITIES</u>

As the *en banc* Fifth Circuit recently summarized:

> A [trial] court's power to grant a new trial has deep roots in our legal
> system.  As early as the fourteenth century, English courts possessed the
> authority—in both civil and criminal cases—to award a second trial when it
> was clear that 'justice ha[d] not been done' by the first.  *See* 3 William
> Blackstone, Commentaries on the Laws of England 387-88 (1772); *Bright v.*
> *Eynon* (1757) 97 Eng. Rep. 365 (KB).  This discretionary power was not meant
> to supplant the jury right but to 'perfect' it.  3 Blackstone 390-91 (explaining
> that the new trial was thought to be an essential means of sustaining public
> confidence in the jury system).  It entitled courts to order a second round of
> jury consideration when the first jury brought in a verdict that was 'contrary to
> the evidence.'  *Id.* at 387.

*United States v. Crittenden*, 46 F.4th 292, 296 (5th Cir. 2022) (en banc).[12]

"A judge should grant a motion for a new trial when the verdict is against the

clear weight of the evidence or will result in a miscarriage of justice, even though

---

[12] S*ee also Aetna Cas. & Sur. Co. v. Yeatts*, 122 F.2d 350, 353 (4th Cir. 1941)
(quoting Lord Mansfield, "Trials by jury in civil causes, could not subsist now without
a power, somewhere, to grant new trials.  There are numberless causes of false
verdicts, without corruption or bad intention of the jurors.") (citation omitted)); *United*
*States v. Gainey*, 380 U.S. 63, 68 (1965) ("Our Constitution places in the hands of the
trial judge the responsibility for safeguarding the integrity of the jury trial, including
the right to have a case withheld from the jury when the evidence is insufficient as a
matter of law to support a conviction.").

there may be substantial evidence which would prevent the direction of a verdict."
*Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 811 (11th Cir. 2020).  Although
granting a new trial is rare, courts do not hesitate to do so when the verdict is
completely unsupported by the evidence.  To allow a jury verdict to stand when
against the great weight of the evidence would be a miscarriage of justice:  "Just as
the Court must not unduly intrude upon the province of the jury, it is a dereliction of
duty to allow a verdict to stand that is not authorized by the evidence."  *Richardson v.
Mason*, 956 F. Supp. 2d 1372, 1381 (M.D. Ga. 2013) (explaining that "appropriate
deference to jury verdicts does not mean blind allegiance to them"); *see also Butts v.
Curtis Pub. Co.*, 225 F. Supp. 916, 920 (N.D. Ga. 1964) ("The power and duty of the
trial judge to set aside the verdict under such circumstances is well established, the
exercise of the power being regarded as not in derogation of the right of trial by jury
but one of the historic safeguards of that right."), *aff'd*, 351 F.2d 702 (5th Cir. 1965),
*aff'd*, 388 U.S. 130 (1967).  "Although a trial judge cannot weigh the evidence when
confronted with a motion for [JMOL], in a motion for a new trial the judge is free to
weigh the evidence. When independently weighing the evidence, the trial court is to
view not only that evidence favoring the jury verdict but evidence in favor of the
moving party as well."  *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241,
1254–55 (11th Cir. 2016) (cleaned up).  And where there is an "absolute absence of

evidence to support the jury's verdict," denial of a new trial motion is error as a matter of law.  *Grandison v. Smith*, 779 F.2d 637, 640 (11th Cir. 1986).

Thus, in *Richardson v. Mason*, the court granted a motion for a new trial where there was insufficient evidence to support the damages amount.  956 F. Supp. 2d 1372, 1380–81 (M.D. Ga. 2013).  Similarly, in *Starbuck v. R.J. Reynolds Tobacco Co.*, the court granted a new trial based on a finding that the verdict for the defendant on an issue was against the great weight of evidence.  102 F. Supp. 3d 1281, 1304-07 (M.D. Fla. 2015).  The court observed that "there were many contested issues later on in the verdict form on which a decision either way would not have surprised me," but that the jury's finding on that particular issue was contrary to the evidence.  *Id.* 1307.

Similarly, the Eleventh Circuit has upheld grants of new trial based on the clear weight of the evidence.  *See, e.g.*, *Johnson v. FFE Transp. Servs., Inc.*, 227 F. App'x 780, 782 (11th Cir. 2007) (affirming grant of plaintiff's motion for a new trial because verdict finding defendants 0% negligent was against the great weight of the evidence); *Ard v. S.W. Forest Indus.*, 849 F.2d 517, 521 (11th Cir. 1988) ("Given this large amount of uncontradicted evidence, the district court . . . properly determined that the jury's verdict was against the great weight of the evidence.").  And federal courts of appeals have not hesitated to overturn denials of motions for new trial based on the clear weight of evidence, notwithstanding the great deference due to trial courts'

17

rulings on new trial motions.  *See, e.g.*, *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 732

(9th Cir. 2007) (district court abused its discretion in denying plaintiff's new trial

motion where jury answered "no" to undisputed threshold question on special verdict

form and did not reach the only issue of disagreement between the parties); *Bank of*

*Am., N.A. v. JB Hanna, LLC*, 766 F.3d 841, 844 (8th Cir. 2014) (reversing denial of

plaintiffs' new trial motion because the jury's finding that defendants did not breach

their contract with plaintiffs was against the great weight of evidence).

"In cases involving simple issues, highly disputed facts, and an absence of

pernicious occurrences, the Court has less freedom to disturb a jury verdict than it

does in cases involving complex issues, facts not highly disputed, and events arguably

marred by error." *Seaberg v. Steak N' Shake Operations, Inc.*, 154 F. Supp. 3d 1294,

1304 (M.D. Fla. 2015) (cleaned up).

## I.   Question 1 On The Verdict Form Addressed Only Ownership, Which Is A Limited Inquiry.

Question 1 on the verdict form asked whether one or more of what Alcoa

claimed as trade secrets (the "Claimed Trade Secrets") were Alcoa's property.  Dkt.

979 at 1.  This question did not ask the jury to decide whether the information

qualified as a "trade secret."  That was covered by questions 2 and 3, which addressed

whether Alcoa's information qualified as "trade secrets" under the GTSA's two-part

definition.  *Id.* 2.  It also did not address whether UAC misappropriated trade secrets,

18

or merely obtained them lawfully from another, because that was covered by question 4. *Id.* 3.  And question 6 asked whether UAC had lawfully acquired any of the trade secrets by independent development.  *Id.* 4.

Thus, question 1 did not address those separate issues; instead, it only addressed the narrow question of whether the information Alcoa claimed to be a trade secret was the property of Alcoa, as opposed to someone else's property.  That question was phrased in terms of what Alcoa claimed – it is like asking whether Alcoa owned the claims asserted.  This question can arise in situations where there is a dispute as to ownership of what is claimed between, say, joint inventors or a licensee – but there was no such dispute in this case.  This meaning of question 1 is reinforced by Instruction No. 8, which makes clear that "Alcoa claims that it owns trade secrets relating to its process to manufacture stretch form spar chords (the 'Claimed Trade Secrets.')."  Day 12 Tr. 14-16.  The instructions then provide only the following as to question 1: "To prove that Alcoa owns these trade secrets, it must prove that they are its property."  *Id.* 16-17.  In other words, Alcoa had to prove that what it claims as trade secrets are its property – after all, it cannot assert claims owned by another.  This also is not a question of independent development – a party can both own a claimed trade secret and it can be independently developed.

Proving ownership of alleged trade secret information is not onerous, as

19

reflected by the Eleventh Circuit's recent decision in *Highland Consulting Group v. Minjares*, 74 F.4th 1352, 1354-59 (11th Cir. 2023).  On appeal of a denial of a JMOL motion under the DTSA, the defendant did not dispute misappropriation or that the information indeed qualified as a trade secret, but argued that the plaintiff did not prove that it – as opposed to one of its affiliates – was the "owner" of the trade secrets under the DTSA.[13]  *Id*. 1353, 1357.  The first question on the verdict form addressed ownership.  *Id.* 1357.  The Eleventh Circuit found the evidence sufficient to support a finding that the plaintiff owned at least one of the alleged trade secrets because the trade secret documents were stamped with the logo of the plaintiff's marketing name, and the stamped documents combined with the owner's testimony (that this was the plaintiff's marketing name) "form an evidentiary basis from which the jury could reasonably have found that the trade secret documents marked with 'The Highland Group Consultants' logo were owned by plaintiff The Highland Consulting Group, Inc."[14]  *Highland Consulting Group, Inc.*, 74 F.4th at 1358.  *See also Refresco Beverages US Inc. v. Califormulations, LLC*, 2021 WL 4316015, at *6 (M.D. Ga. Sep.

---

[13] In contrast to the DTSA, the GTSA requires showing an actionable interest in the claimed trade secret – it is unsettled whether ownership is required.  *Harris v. Orange S.A.*, 636 F. App'x 476, 483-84 (11th Cir. 2015).

[14] The court also found persuasive as evidence of ownership that the owner testified he developed the information and that the information was used by the company's consultants as part of the business.  *Id.* 1358-59.

22, 2021) (allegations that claimed trade secret formulation "was created with equipment, materials, and employees . . . during . . . work hours and at [the company's] facilities" satisfied the ownership requirement).

## II.   The Only Evidence Was That Alcoa Owned The Claimed Trade Secrets.

In its case-in-chief, Alcoa more than satisfied its burden of demonstrating ownership of the information that it claimed to be trade secrets.  There was no contrary evidence, and so the verdict is against the clear weight of the evidence.  As described above, Mr. Colvin clearly testified that Alcoa owned the Claimed Trade Secrets.  Day 2 PM Tr. 135:15-136:10.  That is enough.  But he also went on to testify that Alcoa developed each of the trade secret components and the overall process over the course of decades, that no one else had this information developed by Alcoa, and that Arconic now owned the Claimed Trade Secrets.  *See* Background section C at pp. 10-11, *supra*.[15] The Alcoa logo appeared on all of the alleged trade secret documents identified above.  Mr. Colvin described Alcoa's process of developing the alleged trade secrets through the efforts of Alcoa employees at Alcoa facilities.  *See* Background section C at pp. 10-11.  For additional evidence of ownership, see

---

[15] *See also* Day 3 AM Tr. 90:8 – 91:15 (C545), 110:16-24 (homogenization); Day 3 PM Tr. 7:1-16 (extrusion), 17:11-18:7, 24:23 – 26:15, 31:16 – 32:1 (heat treat), 45:15 – 46:2 (quench), 50:9-23 (stretch percentage), 57:12-20 (jaw designs), 113:17 – 114:3, 115:13-16, 117:6 – 119:4, 123:14-25 (age).

Background section C, *supra*.

This clear and direct testimony on ownership of the Claimed Trade Secrets far surpasses the low standard for showing ownership of the information at issue. *See Highland Consulting Group, Inc. v. Minjares*, 74 F.4th 1352, 1358 (11th Cir. 2023) (ownership shown by documents stamped with the plaintiff's logo, and testimony that that was in fact the plaintiff's logo).

## III.   There Is No Contrary Evidence.

The only evidence in the record is that Alcoa owned the Claimed Trade Secrets. There is no evidence to the contrary. Accordingly, the Court must grant a new trial because "the verdict is against the clear weight of the evidence." *Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 811 (11th Cir. 2020).

Indeed, UAC did not even argue in closing that someone other than Alcoa owned all the Claimed Trade Secrets. The only trade secret UAC referenced in closing as to question 1 was the stretch percentage. Two Boeing employees (Ankenman and Bethards) separately claimed they provided the stretch percentage from referenced industry standards, and UAC's former employee Dangerfield also claimed that he came up with it. None of this evidence relates to ownership of the Claimed Trade Secrets. It may, however, have to do with other questions put to the jury but never reached, such as whether UAC or Boeing independently developed the

stretch percentage, or whether it was common knowledge or readily ascertainable.  It

also could go to whether UAC lawfully acquired the trade secrets from Boeing such

that they were not misappropriated.  These are all separate questions on the verdict

form, and not the subject of question 1.

Regardless, the stretch percentage relates to only one of the many Claimed Trade

Secrets.  The evidence would have to support that **all** Claimed Trade Secrets were

owned by another, not just the stretch percentage.

## IV. UAC's Closing Argument Invited Error And Warrants A New Trial.

UAC's closing also warrants a new trial because it invited error by telling the

jury that it should answer "no" to question 1 if it merely found that Alcoa did not own

its claimed stretch percentage trade secret.  Day 12 Tr. 95:5-16; Ex. A (UAC's

Closing Argument Slides "UAC's Slides") at 47-48.  Even absent objection (as here),

improper attorney argument may be the basis for a new trial "where the interest of

substantial justice is at stake . . . ."  *Christopher v. Fla.*, 449 F.3d 1360, 1366-67 (11th

Cir. 2006) (affirming grant of a new trial based on the plaintiff's closing argument

improperly expanding the grounds of liability, even though there had been no

objection during closing).  Like *Christopher*, where the improper argument expanded

the grounds of liability, UAC's closing argument here improperly narrowed the

avenues for liability, essentially urging the jury to find whether Alcoa had proven

23

ownership of *every* claimed trade secret instead of *any* claimed trade secret. *Id*.

Question 1 asked whether "one or more" of the Claimed Trade Secrets was Alcoa's property – i.e., the jury was not authorized to answer "no" merely because one trade secret allegedly was not owned by Alcoa. Telling the jury that it should answer "no" to question 1 based solely on ownership of stretch percentage inverted the question and erroneously narrowed the grounds for UAC's liability. Instead of requiring a "yes" so long as the jury found Alcoa <u>owned at least one</u> ("one or more") of the Claimed Trade Secrets, UAC argued that the question required a "no" so long as the jury found that Alcoa <u>did *not* own at least one</u> of its Claimed Trade Secrets. In other words, UAC argued in effect that Alcoa must show it owned <u>all</u> of the Claimed Trade Secrets in order to be entitled to a "yes" answer on question 1.

The problem was not confined to question 1. Throughout closing, UAC invited the jury to answer "no" to any question for which it found that Alcoa had not met its burden as to a single trade secret. This reinforced an incorrect standard – that the jury could answer "no" by finding against Alcoa as to a single trade secret. UAC urged the jury to answer "no" on the verdict form – and actually wrote the word "no" on a sample form in court and displayed "no" on its slides – based on arguments as to some individual trade secrets but not all of the trade secrets. *See* Ex. A (UAC's Slides), at 29-55. For example, UAC told the jury "that's a no" for question 2, based

on the argument that the claimed heat treat parameters are readily ascertainable.  Day

12 Tr. 93:24-13.  But this was not a sufficient basis to write "no" – it did not address

whether question 2 could be answered "no" for other Claimed Trade Secrets; instead,

for homogenization and extrusion, UAC said nothing about question 2 and only

addressed question 4.  *See id*. 92:16-25 (homogenization), 93:1-23 (extrusion); Ex. A

(UAC's Slides) at 34-35 (homogenization), 36-39 (extrusion).[16]

Regardless of whether this improper argument standing alone warrants a new

trial, whether the trial is "arguably marred by error" is a relevant factor in deciding

whether to grant a new trial based on the verdict being against the great weight of the

evidence – and that counsels heavily here in favor of a new trial.  *See Seaberg v. Steak

N' Shake Operations, Inc.*, 154 F. Supp. 3d 1294, 1304 (M.D. Fla. 2015); *Ard v. S.W.

Forest Industries*, 849 F.2d 517, 520 (11th Cir. 1988).

## CONCLUSION

Accordingly, Alcoa respectfully requests that the Court vacate the verdict and

order a new trial.

---

[16] Indeed, as to Part I of the verdict form, UAC made arguments as to *all* Claimed
Trade Secrets only with respect to question 3 (reasonable efforts).  *See* Day 12 Tr.
86:24-90:16.

Dated: August 18, 2023

Respectfully submitted,

/s/ Courtland L. Reichman

Jennifer Estremera *(Pro Hac Vice)*
Leaf Williams (*Pro Hac Vice*)
Sara Edelstein *(Pro Hac Vice)*
Laura Carwile *(Pro Hac Vice)*
Gina Diaz *(Pro Hac Vice)*
REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401
jestremera@reichmanjorgensen.com
lwilliams@reichmanjorgensen.com
sedelstein@reichmanjorgensen.com
lcarwile@reichmanjorgensen.com
gdiaz@reichmanjorgensen.com

Caroline M. Walters (*Pro Hac Vice*)
Michael Matulewicz-Crowley *(Pro Hac Vice)*
REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
400 Madison Avenue, Suite 14D
New York, NY 10017
Telephone: (212) 381-1965
cwalters@reichmanjorgensen.com
mmatulewicz-crowley@reichmanjorgensen.com

Courtland L. Reichman
(Georgia Bar No. 599894)
Sarah O. Jorgensen
(Georgia Bar No. 541130)
REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
1201 West Peachtree Street,
Suite 2300
Atlanta, GA 30309
Telephone: (404) 609-1040
creichman@reichmanjorgensen.com
sjorgensen@reichmanjorgensen.com

Christine E. Lehman (*Pro Hac Vice*)
Ariane Mann (*Pro Hac Vice*)
REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
1909 K. Street, NW, Suite 800
Washington, DC 20006
Telephone: (202) 894-7310
clehman@reichmanjorgensen.com
amann@reichmanjorgensen.com

*Attorneys for Plaintiffs and Counterclaim-Defendants, Arconic Corporation and Howmet Aerospace Inc.*

## <u>CERTICATE OF COMPLIANCE WITH LR 5.1(C)</u>

This is to certify that the foregoing document was prepared using Times New Roman 14-point font in accordance with LR 5.1(C).

Dated: August 18, 2023                  <u>*/s/ Courtland L. Reichman*</u>
                                          Courtland L. Reichman

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that I have electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

This 18th day of August, 2023            <u>*/s/ Courtland L. Reichman*</u>
                                          Courtland L. Reichman